**JONES et al. v. DALLAS RY. CO. et al.
(No. 8455.)**

(Court of Civil Appeals of Texas. Dallas. June 26, 1920. Rehearing Denied Oct. 16, 1920.)

1. Street railroads ⊕⇒28(3)—Franchise not restricted to streets used at time of grant.

Franchise granting the right to operate in the city a street railway system "comprising the property now owned and operated" by named existing companies, and such extensions and additions as should be made in accordance with the provisions of such franchise, and providing that additions to such street railway system may be made on order or approval of the board of commissioners, and that "without limiting the generality of the foregoing language" the franchise shall include the right to operate street railway system as then located in certain streets named in exhibit, did not restrict the right to operate street railways to such

streets as were at the time of the granting of such franchise used for such purposes.

**2. Street railroads ☞24(8)—"Franchise" held to confer right to make extensions without vote required for grant.**

Franchise granting right to operate street railway system on certain streets, and providing for extensions of, and additions to, such railway system on order or approval by board of commissioners, *held* to empower the city to authorize an extension by resolution without an additional franchise adopted after three readings and 60 days suspension with opportunity for popular vote as required by Dallas City Charter, the right to construct and operate an addition or extension being not a right to be conferred by a franchise within article 2, § 8, subds. 1-4, but a privilege conferred by the original franchise.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Franchise.]

**3. Street railroads ☞66 — Abandonment of track allowable in absence of franchise provision.**

A street railroad cannot be prevented, not even by the city itself, from removing or abandoning track, in absence of provision in franchise.

**4. Street railroads ☞60—Abandonment with city's consent permissible though abutting owners object.**

Where street railroad's franchise provided that no tracks should be removed or operation of railroad thereon abandoned without the consent of the city, the railroad could remove track and abandon operation on procuring city's consent, notwithstanding opposition of abutting owners on streets affected by such removal.

**5. Judgment ☞713(2)—Upholding validity of election conclusive as to objections which might have been urged.**

Judgment upholding validity of election amending city charter *held* conclusive in subsequent action involving validity of election, not only as against objections urged in prior action, but also as to objections which might have been urged therein.

**6. Municipal corporations ☞46 — Validity of election amending charter cannot be inquired into collaterally.**

In action involving the right of a street railroad to remove tracks from certain streets and extend system in other street in which it was claimed that the city had a right to authorize such extension under the charter as amended, the validity of the election at which the charter was amended will not be inquired into, under Rev. St. art. 3050, since the result of the election cannot be attacked in a collateral proceeding.

**7. Eminent domain ☞275(1), 276—In absence of statute abutting owners have no right to restrain street car operation.**

Abutting property owners have no right to restrain the building or operating on a certain street of a street car line, any more than citizens at large have, unless they are granted such right by legislative authority.

**8. Municipal corporations ☞46—Amendment to city charter authorizing commissioners to extend street car line not unconstitutional.**

Where city charter required consent of property owners on certain street to the granting of franchise entitling street railroad to make extension thereon, the amendment of the city charter so as to authorize the board of commissioners to order such extension without abutting owners' consent *held* not unconstitutional, under Const. art. 11, § 5, and Home Rule Bill, §§ 1 and 2 (Vernon's Sayles' Ann. Civ. St. 1914, arts. 1096a, 1096b), the making of such amendment not constituting the granting of a franchise, but merely the taking away from such abutting owners by amendment authorized by Legislature the right previously given to prevent granting of franchise by withholding consent.

Appeal from District Court, Dallas County; W. C. Kimbrough, Special Judge.

Suit by S. C. Jones and others against the Dallas Railway Company, consolidated with suit by Mrs. Laura Y. Chambers and others against the same defendant, in which the City of Dallas intervened. Judgment for defendants, and plaintiffs appeal. Affirmed.

Muse & Muse and Gresham & Willis, all of Dallas, for appellants.

J. J. Eckford, W. S. Bramlete, and Templeton, Beall, Williams & Callaway, all of Dallas, for appellees.

SYNNOTT, Special Chief Justice. The Dallas Railway Company's Oak Lawn line, running north along Cedar Springs road (street), reaches its furthest point out at Oak Lawn avenue. It then turns eastward, and runs two blocks on Oak Lawn. It then turns back south, and runs two blocks in that direction on Rawlins to Coke. Then it runs an irregular course about two blocks on Coke, Hall, and Dewey, back to Cedar Springs, making a loop, the west side of which is about three blocks long, and the other three sides of which are together about six blocks long. With the approval of the city, the railway company intends, in case this litigation ends in its favor, to take up the three sides of this loop other than the west side on Cedar Springs, and extend the west side two blocks further on Cedar Springs and north of Oak Lawn avenue to Throckmorton, and then run it east on Throckmorton about four blocks, so that the new track would equal about the removed parts of the loop, and be about two-thirds of a mile in length. The new track would be double, except the last two blocks on Throckmorton, while the entire loop is single track, and the changes further contemplate a passing track about the middle of the west side of the loop on Cedar Springs.

S. C. Jones and several others, all property and home owners on the streets from

---

(224 S.W.)

which the three sides of the loop are intended to be removed, brought suit to enjoin the company from removing the three sides of the loop or any part thereof, and a temporary restraining order was granted. In due time an answer and motion to dissolve were filed, and before a hearing was had on the motion to dissolve Mrs. Laura Y. Chambers and several others, all property owners fronting on the streets north of Oak Lawn, upon which the new track is proposed to be laid, filed another suit for injunction to restrain the placing of the new track on those streets.

These cases were thereupon consolidated, and the motion to dissolve in the first case was heard along with the prayer for temporary restraining order in the second. The city of Dallas intervened with leave in the consolidated case, so that now we have a case with four angles; the city and the street railway company, for reasons similar but distinct, seeking to establish the right both to remove the three sides of the loop and make the extensions on north and east, and the property owners on the three sides of the loop seeking to prevent the removal of any existing track, and the property owners on Cedar Springs and Throckmorton north of Oak Lawn seeking to prevent the laying of any other track whether the removal takes place or not. However, as the new track will not be laid unless the old is removed, nor the old removed unless the new is laid, if the contentions of either set of plaintiffs are sustained, it is tantamount to sustaining the contentions of both sets. The contentions of both sets of plaintiffs were denied by the trial court, and they have both regularly appealed to this court.

Prior to 1916 the street railway system of the city of Dallas, comprising about 80 miles of track, was owned and operated by several different independent companies, each owning a few miles of line on certain specified streets which it was operating under a franchise separate from the franchises under which the other parts of the system were being operated.

At that time there were no car lines north of Oak Lawn avenue, nor had any franchises been granted to any one of the companies especially authorizing it to operate north of Oak Lawn avenue. At that time the charter of the city of Dallas provided, and still provides, that the city should not have power to grant any street railway company a franchise upon any streets of the city except by ordinance, which ordinance shall not be passed finally until its third reading, and which three readings shall be at three separate regular meetings, the last of which shall, take place not less than 30 days from the first, and that no such ordinance should take effect until 60 days after its adoption at its third and final reading, and that if at any time before such ordinance finally takes ef-

fect a certain specified petition should be presented to the board of commissioners they should submit the adoption of the ordinance to a popular vote. The charter also provided, and provides, that the commissioners may submit the ordinance to a popular vote on their own motion. Also at that time subdivision 24 of section 8 of article 2 of the city charter provided that no street railway company should be authorized to lay tracks on or occupy any streets until the owners of a majority of the front feet of property abutting, thereon consented thereto in writing, provided that the entire distance of such proposed line should be considered in determining whether the owners of a majority of the abutting property had consented thereto, and the majority therein required should be a majority of the owners of the entire distance on the continuous line.

At an election held April 4, 1916, there were submitted to the voters of the city of Dallas about nine propositions to amend the said city charter, and the further question whether or not the several street railway companies before referred to should be permitted to sell, lease, or otherwise dispose of their lines, properties and franchises, and whether a franchise should be granted to the existing railways under one ownership, with other provisions not necessary to mention here, and also an electric light ordinance.

The first proposition to amend the charter was whether or not seven certain subsections of section 8 of article 2 of the charter should be amended so as to read as named in the proposition, including that of subsection 7 to read as follows:

"The board of commissioners shall have the power, by ordinance or resolution and without reference to the other franchise provisions of this charter, to grant the right and to require street railway companies, gas companies, telephone companies and electric light companies, and all other companies or individuals enjoying a franchise now or hereafter from the city, to make and furnish necessary changes in or reasonable extensions of facilities and service in or to any portion of the city (which shall include in the case of the street railway companies, the building of new or additional lines) as in the judgment of the board of commissioners may be necessary, under and subject to the terms and conditions of the franchise then enjoyed by such franchise holder in connection with which the change or extension is to be made, and under such further terms and conditions as the board of commissioners may deem proper, and the board of commissioners shall have power to prevent the making of unnecessary or unprofitable extensions. Railway extensions, double tracks, switches or sidings ordered by the city to be constructed, shall be laid without the necessity of obtaining consents of property owners having property abutting on the streets or alleys to be occupied thereby, and no such consents need be obtained for new franchises for the operation of tracks, switches and sidings already in use at the time of the granting thereof."

The result of this election was regularly declared to be in favor of the material propositions referred to and of the street railway ordinances referred to.

In November, 1916, there was regularly submitted to popular vote of the citizens of Dallas a proposed franchise by the city of Dallas to C. W. Hobson and assigns, the assigns now being the Dallas Railway Company, in which, after defining the terms "extensions, betterments, and improvements," and other terms therein used, it was proposed to grant to Hobson and assigns a franchise to own, control, and operate all the street railway lines theretofore owned and operated by the other companies hereinbefore mentioned, and we will consider later how much further, if any, this franchise goes.

The franchise further provides that in case of any proposed change, betterment, or reconstruction, or improvement in the lines, a special improvement requisition shall be filed with the city commissioners, who shall have the power to permit or forbid the construction to proceed.

The franchise further provides that Hobson shall forthwith organize a new company to take over the lines and operate them under the authority contained therein.

As a result of this election these franchises were regularly declared adopted, and the Dallas Railway Company was organized, took over the lines, and went to operating them.

Some time prior to December 10, 1917, the new company filed with the supervisor of public utilities of the city of Dallas a requisition to make the changes in its lines set out in the first paragraph hereof. On said December 10th the supervisor of public utilities, stating that these plans had been approved by Geo. E. Kessler, city plan expert, recommended that the commissioners grant the privilege to make the changes. The recommended action seems to have been taken by the commissioners at a date not shown by the record. Prior to March 28, 1918, the railway company made another requisition of similar import with probably more specific descriptions of the proposed changes. They seem to have been referred to what is called the City Plan Company, and on July 15, 1919, in a communication to the commissioners the City Plan Company adopted the requisition theretofore adopted by the commissioners on November 28, 1917, and that on July 16, 1919, the city commissioners adopted the requisition as embodied in the last application filed by the railway company, and authorized the company to proceed to make the changes therein outlined, which last requisition and application had been filed by the railway company on the 19th of June, 1919. The company was about to proceed to make the changes when the proceedings first set out herein were instituted, and, as before said, will proceed to make the changes therein authorized if the result of this litigation does not prevent.

The appellant S. C. Jones and others, property owners along the loop to be removed, state in their brief:

"The decisive questions involved upon this appeal are:

"(1) That said resolutions constituted no grant of a franchise to said railway company, and did not empower the railway company to act thereunder.

"(2) That the consent of the property owners along the streets to be affected was requisite to enact such ordinance, granting a franchise to the street railway company, which consent admittedly had not been given."

These appellants in their brief confine themselves to an effort to maintain the position indicated by the first question, and the appellants Laura Y. Chambers and others, property owners along the proposed new line, present the legal situation from the viewpoints of these last-named property owners to maintain the position taken as indicated by the second question.

There is only one proposition presented by the Jones appellants in their brief. But as several distinct contentions are made thereunder, we will try to discuss them all. There are two distinct contentions made by the Chambers appellants, which will be considered in their order. The first contention of the Jones appellants is broadly that the Dallas Railway Company has no franchise to construct or operate any car lines north of Oak Lawn avenue. Their more definite contentions will be indicated a little later.

Section 5 of article 11 of the Constitution of Texas provides that cities having more than 5,000 inhabitants may have their charters granted or amended by special act of the Legislature. Chapter 147 of the Acts of 1913, called the Home Rule Bill (Vernon's Sayles' Ann. Civ. St. 1914, arts. 1096a–1096i), provides, in section 1, that such cities may adopt or amend charters by popular vote; and in section 2 it provides for the adoption of the original charter by popular vote, and for submitting proposed amendments to the charter to popular vote.

The city charter provides that no franchise shall be granted to a street railway company to occupy or use or operate a railway along any street except by ordinance passed at its third reading, which shall be at least 30 days from the first reading, and which shall not take effect until 60 days after its passage, and an opportunity to submit which to a popular vote shall have been afforded.

Paragraph 1 of section 2 of the franchise adopted after having been submitted to a popular vote in November, 1916, grants to Hobson and his assigns the right to acquire, construct, reconstruct, use, and operate in the city of Dallas, as then or thereafter constituted, a street railway system comprising

the properties then owned by certain named existing lines, being all the lines of the city system, other systems as might be thereafter acquired, and such extensions and additions as shall be made in accordance with the provisions thereof.

Paragraph 2 of that same section provides that extensions of, and additions to, the existing street railway system, within the present or future limits of the city of Dallas, may be made under this franchise when ordered or approved by resolution or ordinance of the board of commissioners.

Paragraph 4 of this same section provides that the franchise thereby granted shall include, "without limiting the generality of the foregoing language," the franchise to construct, reconstruct, maintain, use, and operate a street railway system, with all the necessary or desirable appurtenances as then located, in and over certain streets named in a certain Exhibit A, no street named in the Exhibit A being north of Oak Lawn. Said section further provides that it is intended that all street railway systems of the city of Dallas are to be consolidated, whether the streets were properly set out in the exhibit or not.

Section 1 of the franchise in its definition defines "extension" to include new or additional street railway lines. The first contention of the appellant is that this franchise, as actually granted, is not broad enough to authorize the railway company to build additional lines north of Oak Lawn avenue, after the requisition for the additional improvements has been approved by resolution of the city commissioners.

[1] We cannot agree with this contention. The first paragraph of section 2 grants the franchise to construct, reconstruct, maintain, lease, use, and operate a railway system in the city of Dallas as said city then was or might thereafter be constituted, comprising the property then owned and operated by certain named street railway companies and interurban terminal companies, together with such other street railway systems, and so on as might thereafter be acquired, and such extensions and additions as should be made in accordance with the provisions thereof. It further provides that extensions of and additions to the existing street railway system in, over, along, under, upon, and across all streets, highways, alleys, bridges, and other public places or parts thereof within the present or future limits of the city may be made under this franchise when ordered or approved by resolution or ordinance of the board of commissioners.

The contention is made that because the first paragraph of section 2 adds to its granting clause a qualifying expression to the effect that it is "comprising the properties now owned and operated" by other existing companies named, the whole franchise is to be construed only as granting to the new company the rights and privileges already held by the old company, and that as the old companies own no specific franchises north of Oak Lawn, the new franchise could not be construed as giving any.

It is further contended that this contention is strengthened by the fact that the fourth paragraph of section 2 grants the power to construct, reconstruct, maintain, lease, use, and operate the railway system as now located in and over and along certain named streets, none of which lie beyond north of Oak Lawn.

We cannot agree with this contention, but think, on the contrary, this paragraph 4 as a whole is meant to explain what is meant by the expression in paragraph 1, beginning with the word "comprising," and is meant specially to take all idea of limitation out of this last-named clause. This paragraph 4 begins as follows:

The grant hereby made includes, "without limiting the generality of the foregoing language," and then proceeds to name all existing lines and streets occupied by them, and then adds that it is intended to consolidate all the city lines, whether properly enumerated in Exhibit A or not. We think this was added for the express purpose of showing that no limitation was meant by the "comprising" clause of paragraph 1.

[2] It is further contended by the appellants that paragraphs 1 and 4, just referred to, do not grant a franchise or privilege to occupy or construct railways north of Oak Lawn avenue, and that the provisions of paragraph 2 of the same section, to the effect that extensions of and additions to the existing street railway system over any and all streets within the present or future limits of the city, may be made under this franchise when ordered or approved by resolution or ordinance of the board of commissioners, is an attempt to empower the city in the future, by resolution, to adopt or grant additional franchises; and that the resolution of the city commissioners, adopting and approving the application for requisition hereinbefore referred to, was an attempt to grant a franchise by resolution, or at least by an ordinance without its three readings and 60 days' suspension with opportunity for popular vote; and that the street railway company is now trying to proceed under a franchise granted by such a resolution, rather than under the expressed authority of a franchise passed as required by the city charter.

The contention of the appellees is that the right to construct these additional lines and occupy these additional streets is granted by the express terms of the franchise itself, and that the requisition and the adoption thereof by the city were mere regulatory acts and control of the enjoyment of privileges already granted by the ordinance itself.

With the latter contention we agree, and,

as already shown, base our agreement principally upon the quoted parts of the franchise just made. The position is strengthened, however, by the following authorities: Mayor, etc., City of Houston v. Houston B. & M. P. Ry. Co., 84 Tex. 581, 19 S. W. 786, middle of last paragraph, 971; Africa v. Board of Mayor & Aldermen of City of Knoxville (C. C.) 70 Fed. 732, last paragraph; Cyc. vol. 28, p. 388; chapter 147, Acts of 1913, middle of page 315; vol. 16, Gammel's Laws of Texas; Thurston v. Houston, 123 Iowa, 157, 98 N. W. 637; State v. City of Wouwatosa, 124 Wis. 451, 102 N. W. 894.

Of course the term "franchise" is a very broad one. But, as the same is used in subdivisions 1 to 4 of section 8 of article 2 of the Dallas City Charter, we do not believe it would apply to the privilege of the Dallas Railway Company to construct and operate an extension of its lines for the short distance along Cedar Springs and Throckmorton streets, heretofore referred to. It has already a franchise to own and operate, and is operating, some 80 miles of track on the streets of Dallas. The additions extend not over two-thirds of a mile. The right to construct and operate this short addition would hardly be considered a "franchise," as that term is used in the subsections just referred to; but would more correctly be considered as an additional privilege, necessary to a proper enjoyment of the franchise already granted. This would most certainly be true under the definition of "extensions," "betterments," and "improvements" contained in the acts granting the franchise itself.

Again, we are most clearly of the opinion that the franchise itself, as enacted after being indorsed by the popular vote, includes the privilege of constructing and operating this additional line.

We think the franchise grants the privilege of using any street in the city of Dallas as it then was or shall be in the future, and the action of the board of commissioners in permitting or requiring particular extensions over particular streets is the exercise of a regulatory power and not the granting of a new franchise.

This suit involves an effort to restrain the removal of the three sides of the loop as well as the construction of the new lines. In fact, this seems to be the sole object of the Jones plaintiffs.

Section 30 of the franchise provides that, without the consent of the city expressed by resolution or ordinance of the board of commissioners, no tracks shall ever be removed from any street, nor shall operation thereon be abandoned. In this case the defendant had the active consent of the city to remove these tracks and abandon their operation.

[3, 4] Except for this provision in the franchise no one, not even the city, could prevent the removal or abandonment of this track. And, since the defendant has the consent of the city, no one has any standing in court in opposition to the defendant's right of removal. San Antonio Street Ry. Co. v. State, 90 Tex. 520, 39 S. W. 926, 35 L. R. A. 662, 59 Am. St. Rep. 834; Selectmen of Amesbury v. Citizens' Electric Ry. Co., 199 Mass. 344, 85 N. E. 419, 19 L. R. A. (N. S.) 865; State ex rel. Knight v. Helena Power & Light Co., 22 Mont. 391, 56 Pac. 685, 44 L. R. A. p. 692. It thus seems clear that if the plaintiffs have any right, it must be the right to prevent the laying and operating of the new track, and not the right to prevent the removal or abandonment of the old.

We have already considered the contention that the railway company has no legal franchise to construct or operate the new line. It remains for us now to consider only the second question raised in the contentions of the Jones appellants, as heretofore quoted from their brief, to the effect that the consent of the property owners along the new line was necessary as a prerequisite to the new line's construction. This calls for a consideration of the two propositions discussed in the brief of the Chambers appellants. The first of these propositions is that the first proposition of the official ballot submitting to the voters of Dallas at the election on the 4th of April, 1916, the matter of amending certain subsections of section 8, art. 2, the City Charter, including subsection 7, relating to the obtaining of the consent of property holders to laying and operating street car lines was in form so violative of the constitutional and statutory requirements as to render the attempted amendment of said section 7 wholly void. The record shows that this first proposition included the question whether or not seven different subsections, including subsection 7, should be amended, and that the answer "Yes" or "No" required must determine the amendment vel non of all seven. There is no attempt by a statement in either brief, nor by citation of authority in any brief, to show that these seven subsections presented more than one subject, so as to bring the proposition within the inhibition of law contended for.

We do not attempt by search of the statement of facts to determine this, both because counsel have not seen fit to inquire into it, and because we do not think it is essential to a proper decision of this case.

[5, 6] The proper city authorities canvassed the returns of this election and declared the amendment carried. There was a statutory contest of the results of that election, and the legality of the election was upheld by this court in the case of Shaw et al. v. Lindsley, 195 S. W. 338. Appellants contend that they are raising questions here concerning the validity of that election which were not raised in the other contest. Even if this be true, all these contentions could have been raised, and the estoppel of the

judgment extends to all matters that might have been urged as well as to those actually urged. But aside from this, this is an attack upon this election in a collateral proceeding. The statute provides for a tribunal to canvass and declare the result of this election. That was done. The statute then furnished a proceeding by which that result could be questioned by the courts in a direct proceeding. To say the least, this is not such proceeding. Therefore the result of the election cannot be here inquired into. Cyc. vol. 11, p. 527; Austin v. G., C. & S. F. R. R. Co., 45 Tex. 270; County of Anderson v. H. & G. N. Ry. Co., 52 Tex. 228; City of Ft. Worth v. Davis, 57 Tex. 234; Cyc. vol. 15, p. 387; Revised Statutes of Texas, art. 3050.

The second and last proposition advanced contains the contentions that it was necessary to have the consent of the property owners along the new line, because the attempted amendment of the city charter, eliminating the requirements, or rather providing that railway extensions, double tracks, switches, or sidings ordered by the city to be constructed, shall be laid without the necessity of obtaining the consent of the property owners having property abutting on the streets or alleys to be occupied thereby, being an amendment of the city charter by popular vote, is without constitutional or statutory authority, and therefore void.

The only constitutional provision we have been referred to as affecting the question is section 5 of article 11, which provides that cities of 5,000 inhabitants or more may have their charters granted or amended by special act of the Legislature. Statutory authority cited by appellants for this last contention is what is known as the "Home Rule Bill," before cited.

Sections 1 and 2 of this Home Rule Bill especially provide that the voters of the city may adopt or amend the city charter in any particular by popular vote. We hardly think the same act could be cited as providing against such amendment by popular vote. The part of this Home Rule Bill referred to in arguments as inhibiting the very thing that the Home Rule Bill specially provides for, as here quoted, is the provision therein that no charter or amendment shall grant a franchise to a street railway company to occupy the streets. The amendment actually enacted by the popular vote was that extensions might be made when ordered by the city without procuring the consent of property owners.

[7] The argument is made that this constituted the granting of a franchise. Abutting property owners have no right whatever to restrain the building or operating on a certain street or street car line, any more than the citizens at large have, unless they are granted the same by the legislative authority.

Cyc. vol. 36, p. 1382, G. H. & S. A. Ry. Co. v. Houston Electric Co., 57 Tex. Civ. App. 170, 122 S. W. 287; Rische v. Texas Transportation Co., 27 Tex. Civ. App. 33, 66 S. W. 324; Aycock v. S. A. Brewing Ass'n, 63 S. W. 954; Gray v. Dallas Terminal Co., 13 Tex. Civ. App. 158, 36 S. W. 352.

[8] The only legislative authority given to them is contained in the city charter. The same Legislature provided by another statute that by popular vote the people might amend or take away that power from the abutting property owners. This the voters of the city of Dallas did. That was not in any sense the granting of franchise.

It is next contended on the authority of S. W. Tel. & Tel. Co. v. City of Dallas, 104 Tex. 114, 134 S. W. 321, and Lindsley et al. v. Dallas Consolidated Street Ry. Co. et al., 200 S. W. 207, that the provisions that extensions of railway lines might be made by order of the city commissioners, without requiring consent of abutting property owners, is inherently of such a nature that the voters by popular vote could not pass upon it. Both those cases had to do with ordinances by popular vote under the provisions of the charter. In the instant case we have to do with an amendment of the city charter directly authorized by the Legislature.

In the telephone case cited the Supreme Court held that the city charter itself provided against the submission of an ordinance fixing rates to popular vote, and urged as one reason for so holding that the charter itself provided for a fair hearing on the reasonableness of such rates, which it held to be proof that it was not intended that the same should go before the people, because no hearing could there be had.

In the last-cited case this court applied the same construction to the city charter and the same doctrine to the "Jitney Ordinance" for the same reasons, to wit, that the ordinance involved the fixing of rates, compensation, and other matters which the commissioners alone could determine after a fair hearing, which the electorate before a popular vote could not give. We can see no authority in these two cases for the contention that the Legislature did not have the power to authorize the electorate by popular vote to take away a mere privilege which it had given to abutting property owners, to which they had no inherent right whatever. The Chambers appellants present briefly another contention, to wit, that even though the city charter and franchises do not require defendant to obtain consent of abutting property holders before extending its line, yet it accepted the franchise under which it is acting at a time when the charter and franchises did so require, and is bound thereby to do so, and is estopped to deny such obligations. Without in any way admitting that such legal conclusion would necessarily

follow, if the facts as stated existed, it is sufficient to say that this amendment was inserted in the city charter in April, 1916, and the franchise was not adopted until November following.

For the reasons stated, all assignments are overruled and the judgment of the trial court is affirmed.